THE ATTORNEY-GENERAL, EX REL. THOMAS J. PIERSON
ET AL., v. JOHN M. CADY ET AL.

Argued February Term, 1913—Decided March 12, 1913.

1. In determining whether a clause in a statute repugnant to the
   purview of the act is a saving clause or a proviso, the court
   ought to ascertain, if possible, which expresses the later intent
   of the legislature.
2. The act of 1908 as to the reorganization of boards of chosen
   freeholders (*Comp. Stat.*, p. 509, *pl.* 131) contained a proviso
   that the act should not apply to counties of the second class,
   although the rest of the section expressly included counties with
   the requisite population. *Held*, that the proviso must prevail
   over the rest of the section.
3. An act to reorganize boards of chosen freeholders is not uncon-
   stitutional as special legislation, though counties of the second
   class are excepted from its operation.
4. The title of an act is not insufficient under the constitutional
   provisions merely because it is broader than the act itself, with-
   out being deceptive.
5. The validity of a referendum election for or against a statute
   depends upon the acceptance by the voters of the very act sub-
   mitted; the courts cannot guess at the intention of the voters.
6. At a referendum election for or against a statute reorganizing
   boards of chosen freeholders, the voters of every county are en-
   titled to the like chance to express their will; hence where the
   referendum election was ineffective to adopt the statute, the defect
   cannot be cured by subsequent legislation that does not give the
   voters the same chance to express their will as voters in other
   counties.

On *quo warranto*.

Before Justices Swayze and Kalisch.

For the relators, *John K. English* and *William R. Wilson*.

For the defendants, *Gilbert Collins* and *Robert H. Mc-
Carter*.

The opinion of the court was delivered by

Swayze, J.   The relators claim title to the office of chosen
freeholders of Union county, under the act of 1902, amended

in 1908 (*Comp. Stat., p.* 509, *pl.* 131), and revised in 1912. *Pamph. L., p.* 619. The defendants claim title to the same office under the legislation existing prior to the act of 1902. The act of 1902 was to take effect only when adopted by vote of the legal voters of the county. An attempt to adopt it had been made in Union county in 1911.

The county of Union is a county of the second class, that is, a county with a population of not less than fifty thousand nor more than three hundred thousand inhabitants. *Pamph. L.* 1911, *p.* 19. By the amendment of 1908 a proviso was inserted in section 1 of the act of 1902, in the following language: "Provided, however, this act shall not apply to counties of the second class." Obviously, if this proviso is to control and the statute with the proviso was within the power of the legislature to enact, the adoption of the act of 1902 in 1911 was without warrant of law. The relators advanced two claims by way of attack upon the proviso. They say—*first,* that the proviso is repugnant to the rest of the section and must be rejected, and *second,* that if the proviso is sustained the act then becomes unconstitutional.

We think the first contention is untenable. The proviso is indeed repugnant to the rest of the section, but the question is whether the proviso or the other language is to prevail. A distinction is made in the cases between a saving clause repugnant to the purview of the act, and a repugnant proviso. *Townsend* v. *Brown,* 4 *Zab.* 80; *Clark Thread Co.* v. *Kearny Township,* 26 *Vroom* 50. In the first-cited case Mr. Chief Justice Green said: "The rule has long been established, that if a proviso in a statute be directly contrary to the purview of the statute the proviso is good, and not the purview, because it speaks the later intention of the legislature." The rule was recognized by Mr. Justice Van Syckel, in the last-cited case, although he quoted from Sedgwick and Chancellor Kent as to its arbitrary character. If we take only the words of the act, the clause forbidding its application to second-class counties is undoubtedly a proviso; it is so denominated by the legislature itself, and upon the rule of law above stated this clause would nullify the preceding portion of the

section. It would, however, be too narrow a view to make the case turn on the mere fact that the legislature had used the word "provided," instead of the words "saving and excepting." As Mr. Justice Van Syckel said in Clark Thread Co. v. Kearny Township, we ought to ascertain, if possible, which part of the section expresses the latest intent of the legislature. / Ordinarily the clause coming last in the act represents the last intention of the lawmaker. In the present case we have a section which, as amended in 1908, carefully provides for the selection of freeholders in all counties whatever their population. In counties having between one hundred thousand and two hundred thousand, seven were to be elected. In counties having between fifty thousand and one hundred thousand, five were to be elected. These counties included all counties of the second class, as the classification then was. It would be attributing absurd conduct to the draughtsman of this act to suppose that the original intent was to exclude second-class counties from the operation of the law, and that this intent was altered by afterwards providing especially for counties of the requisite population. It is much more probable that the act as originally drafted and introduced contained distinct provisions for counties having from fifty to one hundred thousand population, and counties having from one hundred thousand to two hundred thousand, and that it was amended in its passage through the legislature by adding the proviso excluding second-class counties from its operation. This is all the more probable for the reason that Monmouth, a county of the second class, had in 1905 adopted the act of 1902. *Patterson* v. *Close*, 53 *Vroom* 160. But for the proviso in the act of 1908, the county of Monmouth would have been subject thereto, and it seems probable that the representatives of that county induced the legislature to refuse to change its government within three years after it had begun the trial of the act of 1902, and while litigation growing out of the change was still pending. Tacking the proviso to the act as originally drawn was a ready way of accomplishing this end, and it was not unnatural in the haste of legislation to overlook the repugnancy thus created. We can-

not resort in aid of this construction to the history of the legislation in the process of passage through the senate and house of assembly. *Standard Underground Cable Co.* v. *Attorney-General*, 1 *Dick. Ch. Rep.* 270. It is, however, reassuring to know that in fact the proviso was adopted as a senate amendment to a bill originating in the house of assembly.

The next question is whether the effect of holding the proviso to control rather than the purview of the section, is to make the amendment of 1908 unconstitutional. The argument is that there is no rational basis for a distinction between the number of freeholders and the constituency that elects them in counties having less than fifty thousand or more than two hundred thousand inhabitants on the one hand, and counties having between fifty thousand and two hundred thousand on the other hand. This question, however, is set at rest by the decision of the Court of Errors and Appeals. *Attorney-General* v. *McKelvey*, 49 *Vroom* 621. It was there held, upon the authority of the earlier cases, that a law is general within the constitutional provision as to towns and counties, although it embraces only a class formed on the basis of population according to the discretion of the legislature, provided that the law deals merely with the structure and machinery of government, and the class does not appear to have been formed illusively; and a classification for that purpose will not be deemed illusive merely because the effect is to make the legislation applicable to municipalities of a certain size only. In the present case the legislation relates to the structure and machinery of government. It is applicable to all counties that may at any time possess the specified population. It was therefore entirely within the discretion of the legislature whether the act should apply to first-class counties and third-class counties, and not apply to second-class counties. The McKelvey case was itself a case of an intermediate class. Under the rule of that case it would clearly have been permissible for the legislature to provide in a separate act for the organization of the board of freeholders in counties of the first and third class. This is all they have done by excluding second-class counties from the operation of the act of 1908.

It is also argued that the act of 1908 is unconstitutional because the object is not expressed in the title. The point of the argument is that the title indicates an intention to legislate for all the counties of the state, while the act itself with the proviso applies only to first and third-class counties. This argument overlooks the well-established distinction made in the cases between a title that is deceptive because it purports to include more than is in fact included, and a title which is merely broader than the act itself, without being deceptive. *Beverly* v. *Waln,* 28 *Vroom* 143, was a case of the first class, and the distinction was carefully stated by Mr. Chief Justice Magie in *Johnson* v. *Asbury Park,* 31 *Id.* 427 (at *p.* 432). Referring to Beverly *v.* Waln, he said: "It was not held, nor was it intended to hold, that an act legislating respecting some objects fairly included within the title, will be invalidated because it does not include all such objects except where the title, expressly or by necessary implication, evinces an intent to legislate as to all of them." This rule is thoroughly established, and it is unnecessary to refer to later cases other than *Allison* v. *Corker,* 38 *Id.* 596. It is, however, urged that the act of 1908 by its title as amended in 1909, does evince an intent to legislate for the several counties of the state. We are unable to see how any argument as to the constitutionality or the proper construction of the act of 1908 can be derived from the change in the title by the act of 1909, one year later. If that act had the effect claimed it might be unconstitutional, but could not vitiate a pre-existing valid enactment.

The legislature itself seems to have realized the difficulty with the attempted adoption of the act of 1902 by the referendum in Union and other counties in 1911, and in 1912 and 1913 several attempts were made to validate these elections. We pass over the very serious question that the case presents whether the so-called election was in fact an election or a mere voluntary attempt of a considerable number of voters to hold an election. The difficulty, of course, is that an election must be held under authority of law in order to bind the voters who either take no part at all or fail to vote upon the

particular question submitted. If it is an election held in pursuance of law, voters are properly held bound to vote or submit to the action of those who do. *Bott* v. *Secretary of State,* 33 *Vroom* 107; *S. C.,* 34 *Id.* 289. If, however, the proceedings are without authority of law, no voter is bound to take notice thereof, and he cannot be held to have assented by implication to the acts of those of his fellow citizens who chose to place upon their ballot an affirmative vote. The difficulty is well illustrated by a case like the present, where the affirmative vote was only a little more than one-third of the ballots cast, and did not suffice to carry the election unless the voters who did not vote at all on the question are to be held bound by the result. This question, however, is not necessarily involved in the present case, inasmuch as we think that none of the attempts to validate the so-called election accomplished the object.

Chapter 181, *Pamph. L.* 1912, *p.* 278, applies only to elections for the acceptance or rejection of an act to reorganize boards of chosen freeholders of the several counties of this state, reducing the membership thereof, and fixing the salaries, and providing for the election and terms of office of the members, and also for the appointment and terms of officers appointed by such boards in conformity with the provision of section 7 of the act. If we disregard as too technical the fact that the voters of Union county did not vote for the acceptance of an act with that title, but voted only for the adoption of the act reducing the number of members of the board of chosen freeholders, approved March 26th, 1902, we should still find it impossible to hold that chapter 181 of the laws of 1912 was effective, since the only election that it attempts to validate is one held in conformity with the provisions of section 7. That section provides that there shall be printed on each ballot the proposition, "For the law reducing the number of freeholders," and "Against the law reducing the number of freeholders." This is obviously a different question from the one submitted in Union county, which was: "Shall the act reducing the number of members of the board of chosen freeholders, approved March 26th, 1902, be adopted?"

At that time the act of 1902 was no longer in force, and could not be legally adopted. It had been materially changed by the act of 1908, and the adoption of the act of 1908 was not submitted to the voters. Had the proposition been placed upon the ballot in the form indicated by section 7, "For the law reducing the number of freeholders," the voter might well be supposed to have understood that the law he was voting for was the then existing law no matter when it was passed, but when he saw from his ballot that he was called upon to vote for or against the act of March 26th, 1902, he naturally would look, or must be presumed to have looked, at that act. We cannot assume that in voting for the act of March 26th, 1902, he expressed approval of changes in the terms of the officials made thereafter by amendment. The voters of Union county voted to adopt an act that did not exist, and did not vote in accordance with the provisions of section 7, in favor of the general principle of the then existing law reducing the number of freeholders. We have no right to guess that all they cared for in the act of 1902 was the reduction of the size of the board. They may have cared more for the two years' term. Guesses by a court as to the intention of voters at a referendum election would be a hazardous method of determining the statute law. The validity of a referendum depends upon the acceptance by the voters of the very act submitted by the legislature. *Attorney-General* v. *McGuinness*, 49 *Vroom* 346. The act of the legislature and the act of the voter must concur. This concurrence did not exist in this case.

Chapter 314 of the laws of 1912 (*Pamph. L., p.* 553) is open to the same objection. It validates elections where the act of 1902 and the supplements and amendments thereto had been submitted to the legal voters of the county, and the majority of the votes cast at such election was in favor of the adoption thereof. Here it was the already superseded act of 1902 alone for which they voted. No opportunity was afforded them to vote upon the supplements or amendments thereto. Moreover, chapter 314 seems intended to cure only irregularities in the submission of the question. It is much more than a mere irregularity when the voters are given no opportunity

to express their opinion upon the supplements and amendments to the act. Chapter 355 of 1912 provides as the original act of 1902 did for the adoption of the act by a referendum, but the provision for the referendum does not apply either to counties which have already adopted the act of 1902 and organized the board thereunder, or to counties that have already adopted the act of 1902, in which no board has as yet been elected thereunder. All acts and parts of acts inconsistent with it are repealed. The effect of this act in Union county would be that the voters would be subjected to its operation without having any opportunity to vote thereon, while other counties which had not already gone through the form of an invalid referendum would have the privilege of accepting or rejecting the act of 1912. The evil of this appears strikingly in the case of the Mercer county freeholders argued at the same time with the present. Under the act of 1902, with its amendments and supplements, Mercer county would have a board of seven freeholders, and if the election, so called, of 1911 can be supposed to have expressed the will of the voters, they voted for a board of seven freeholders. Under chapter 355 of the laws of 1912, Mercer county would have five freeholders, and the voters would have had no opportunity to express their views on that proposition. The difficulty is quite as great in Union county. The voters had voted for an act which provided for a board with a two years' term for each member, running concurrently. Without having the opportunity afforded to the voters of other counties, the voters of Union would have a board with terms of three years, the members being classified so that their terms would not expire concurrently. An attempt is made in counsel's brief to vindicate the distinction thus made between different counties by the suggestion that it tends to produce uniformity in the constitution of the boards of freeholders throughout the state. That is not the fact; the most that can be said is that it tends to produce that uniformity in counties that have adopted either the act of 1902, with or without the amendments, and the act of 1912. These counties differ from the other counties only in the fact that they have accepted the new legislation by

a referendum; and, obviously, if the acceptance of an act by a referendum is to be made the mark of distinction, all counties resorting to a referendum should have the same chance. The whole scheme of the act of 1902, and the various acts passed since, requires the assent of the voters. The effect of chapter 355, if it is held to validate the prior invalid elections, is to deprive the voters of some counties in the state of that privilege. The value of a referendum must lie in the fact that it is an expression of the popular will, and the voters of every county are entitled to the like chance to express their will. To hold otherwise would violate the fundamental principles of what is now called direct legislation; in counties voting under the act of 1912, the legislation would be accepted by the people; in counties that had already voted, the legislation would be imposed by the legislature. We cannot hold that chapter 355 applies to Union county. Chapter 274 of 1912 is hardly relied on by the relators. It does away with the necessity of a referendum in counties having between one hundred and twenty-five thousand and one hundred and forty-one thousand population. Obviously, the legislature cannot, in legislation that relies for its becoming effective upon a popular vote, deprive those counties of the same right that is conceded to other counties.

This legislation of 1912 was as unsatisfactory to the legislature as it is to us, and three acts have been passed in 1913. Chapter 2 applies only to elections theretofore held and attempts to cure only defects in the notice of election, in the calling of the same, and in the method of manner of submission or certification thereof.

Chapter 4 applies only to freeholders elected pursuant to the provisions of chapter 355 of the laws of 1912. For reasons already stated, this act is inapplicable to Union county. The relators could not have been elected pursuant to the provisions of that act, since it required a referendum which had never been had in that county for that act.

Chapter 5 validates all· elections heretofore held for the adoption of the provisions of any law for the reduction of the number of members of the board of freeholders, notwithstand-

ing any omission, defect or irregularity in the giving of the notice of the calling of such election, or the conduct, submission or the certification of the same, and notwithstanding the question should have been submitted by the title of the act sought to be adopted, or any words designed or purporting to give notice to the legal voters that the object of the election was for the purpose of having a reduced number of members of the board of chosen freeholders. This act does not apply to the present case. It validates an election at which an existing law was adopted. The act of 1902 was not law in 1911; it had been essentially modified in 1908, was no longer applicable to second-class counties, and the amendments of that year were never voted on. Even if the referendum of 1911 were validated, however, it would be of no avail, since it could do no more than make effective the act as it then was, and that act was repealed in 1912. When the relators were elected, the only act under which they could be elected was chapter 355 of the laws of 1912, and that act at best was ineffective without a referendum thereon, which has not been had in Union county.

As to those of the defendants whose terms would otherwise have expired, they hold over because no successors have been chosen and qualified. *Comp. Stat., p.* 3489, *pl.* 130; *Wright* v. *Campbell,* 45 *Vroom* 609. The other defendants hold to the ends of their terms. The defendants are entitled to judgment.